IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 22, 2010


**RAYMOND DOUGLAS MYERS v. STATE OF TENNESSEE**


**Appeal from the Criminal Court for Putnam County**
**No. 01-0401A    David Patterson, Judge**

---

**No. M2009-02076-CCA-R3-PC - Filed August 23, 2010**

---

Petitioner, Raymond Douglas Myers, was convicted of three counts of first degree murder, two counts of felony murder, one count of aggravated arson, and one count of conspiracy to commit murder. *See State v. Raymond Douglas Myers, Sr.*, No. M2003-01099-CCA-R3-CD, 2004 WL 911280, at *1 (Tenn. Crim. App., at Nashville, Apr. 20, 2004), *perm. app. denied*, (Tenn. Nov. 8, 2004). The trial court merged the felony murder convictions and the conspiracy to commit murder conviction with the three convictions for first degree murder. *Id.* Petitioner was sentenced to consecutive life sentences without the possibility of parole for the murder convictions, and a consecutive twenty-four year sentence for the aggravated arson conviction. On direct appeal, this Court affirmed the judgments of the trial court. *Id.* at *7. Petitioner sought post-conviction relief in a lengthy pro se petition. Counsel was appointed. After a hearing on the petition for relief, the post-conviction court denied the petition. Petitioner has appealed the denial of post-conviction relief, arguing that the post-conviction court should have determined that Petitioner received ineffective assistance of counsel at trial. After a thorough review of the record, we determine that Petitioner has failed to show that he received ineffective assistance of counsel. Accordingly, the judgment of the post-conviction court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed**

JERRY L. SMITH, J., delivered the opinion of the court, in which THOMAS T. WOODALL and J.C. MCLIN, JJ., joined.

Rebecca Brady, Cookeville, Tennessee, for the appellant, Raymond Douglas Myers.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Bill Gibson, District Attorney General, Lisa Zavogiannis and William Locke, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

At trial, the following testimony, as summarized by this Court on direct appeal, led to Petitioner's convictions:

On July 30, 1999, the McMinnville Fire Department responded to a house fire. Inside the house, firefighters discovered the bodies of Dianne Watts, her daughter Jessica Watts, and Chelsea Smith, Jessica Watt's [sic] friend who spent the night with her on July 29. Dianne Watts, her daughter Jessica, and Dianne Watt's [sic] boyfriend, the Defendant, lived together in the house that burned. The Defendant had lived there about six years. Investigators with the fire department determined that the fire was deliberately set with an "ignitable liquid fuel" based upon burn patterns and the presence of an accelerant in the bedrooms, in the hallway, on the bed, and on the clothes of Chelsea Smith and Jessica Watts. Firemen also recovered a metal baseball bat from the hallway and a torque wrench from the area immediately at the front door of the house.

Dr. Bruce Levy, who performed the autopsies on the victims' bodies, testified that he identified five injuries to Chelsea Smith's head and one to her groin. She died as a result of the blunt-force injuries and smoke inhalation. Dr. Levy testified that the injuries to Ms. Smith were consistent with full-swing blows from the torque wrench. The evidence of smoke inhalation indicates that Ms. Smith was alive when the fire was set.

Dr. Levy also testified that he found two injuries on Jessica Watts' head that he believed to have been caused by blows from the torque wrench. The immediate cause for Ms. Watts' death was smoke inhalation.

With respect to Dianne Watts, Dr. Levy found two severe injuries to her head that he believed were caused by the baseball bat. Raymond DePriest, a forensic scientist with the Tennessee Bureau of Investigation, testified that a DNA analysis of blood from the baseball bat showed the blood to belong to Dianne Watts.

-2-

Four persons were indicted for the murders, arson, and conspiracy to commit the murder of Diane Watts: the Defendant, the Defendant's friend Johnny Lee Lewis, the Defendant's mother Clementine Myers, and the Defendant's brother Gary Myers. The State's theory was that the four of them conspired to kill Dianne Watts because she had information regarding criminal activity in which they engaged. Gary Myers' house had been burglarized, and he and Clementine Myers believed that Ms. Watts was responsible. Gary Myers had been investigated for bankruptcy fraud and food stamp fraud, and the conspirators thought Ms. Watts had information related to the investigation for fraud.

The State offered the testimony of the Defendant's estranged wife, who heard him and Johnny Lewis talking about how Ms. Watts was "running her mouth," and that Clementine Myers wanted Ms. Watts "shut up." The day before the murder, Mr. Lewis bought approximately five two-gallon jugs of gasoline. Shortly after the murders, the Defendant gave Mr. Lewis nine hundred dollars that came from Clementine Myers. On the morning following the murders, Gary Myers called the Defendant at approximately 6:20 a.m. and tape recorded a brief portion of their conversation, which the State characterized as an attempt to create an alibi for the Defendant.

Throughout the trial, the prosecution offered the testimony of witnesses who had heard the Defendant, Johnny Lewis, and Clementine Myers make incriminating statements and threats regarding Ms. Watts. Several witnesses testified to details of the burglary of Gary Myers' house and the exchange of a stolen tractor for methamphetamine by the Defendant and Mr. Lewis.

*Id.* at *1-2. At the conclusion of the trial, Petitioner was convicted of three counts of first degree murder, two counts of felony murder, one count of aggravated arson, and one count of conspiracy to commit murder. *Id.* at *1. The felony murder convictions and the conspiracy to commit murder conviction were merged with the three convictions for first degree murder. *Id.* Petitioner received consecutive life sentences without the possibility of parole for the murder convictions, and a consecutive twenty-four year sentence for the aggravated arson conviction.

On direct appeal, Petitioner challenged the sufficiency of the evidence. *Id.* Petitioner also argued that Tennessee's first degree murder sentencing statute is unconstitutional, and that the trial judge improperly instructed the jury regarding the State's burden of proof. *Id.* This Court affirmed the judgment of the trial court.

On July 25, 2005, Petitioner filed a pro se post-conviction petition that alleged numerous instances of ineffective assistance of counsel and prosecutorial misconduct. On October 15, 2007, Petitioner filed an amendment to the petition. On March 25, 2008, Petitioner filed another amendment and memorandum of law in support of the petition for relief. From what we can discern from the over one-hundred page document, Petitioner complained that: (1) trial counsel failed to adequately prepare and investigate his case; (2) trial counsel failed to present witnesses; (3) trial counsel failed to present an adequate defense; and (4) original counsel was incompetent. In other words, various instances of ineffective assistance of counsel affected Petitioner's trial. Petitioner complained that the following instances of prosecutorial misconduct also occurred during his trial: (1) the prosecutors threatened witnesses; (2) the prosecutors manipulated witness testimony; and (3) the civil rights of one of the witnesses were violated.

The post-conviction court eventually held a hearing on the petition for post-conviction relief. At the hearing, Petitioner presented several witnesses. Dan McInnis testified that he was not called as a witness at trial. According to Mr. McInnis, his testimony would not have been helpful for the defense or the prosecution. Mr. McInnis stated that, if called to testify at trial, he would have informed the jury that on July 30, 1999, he went to work between 7:30 and 8:30 a.m. When he unlocked his shop door, he saw Petitioner coming around the corner. Mr. McInnis waved at Petitioner, and Petitioner waved back. Petitioner was walking in the direction of the grocery store in Viola. Mr. McInnis also saw Petitioner driving a little car. Mr. McInnis testified that Petitioner normally drove a pickup truck that had a loud, distinct sound. On cross-examination, Mr. McInnis could not say for certain what day he saw Petitioner.

Terry Coppinger testified to the post-conviction court that he lived two houses away from Petitioner's mother. Mr. Coppinger saw Petitioner's truck parked in Petitioner's mother's driveway the week of the murders. The truck was sitting in the yard between his mother's house and the neighbor's house and had been sitting there for several days. Mr. Coppinger confirmed that Petitioner's truck had a loud, distinct sound. Mr. Coppinger did not remember hearing the truck that week. Mr. Coppinger typically left for work between 6:00 and 6:15 a.m. On the morning of the murders, Mr. Coppinger took another way to work and did not see if Petitioner's truck was in the driveway at Petitioner's mother's house.

Jim Bonner lived directly across the street from Petitioner's mother's house. Mr. Bonner testified that he too saw Petitioner's truck parked outside the house the week of the murders. In fact, he heard Petitioner complain that the truck was broken. Mr. Bonner recalled that the truck stayed at the house from Tuesday to Saturday, the day of the murders. Mr. Bonner recalled the distinct sound made by Petitioner's truck and testified that if it were started in the middle of the night, he would have heard it.

Mr. Bonner testified at the post-conviction hearing that he saw Petitioner's truck on the morning of the murders. It was parked at Petitioner's mother's house. Petitioner's mother, Clementine Myers, called Mr. Bonner that morning around 7:45 a.m. to tell him that "Diane and them [sic] kids got burnt up." Petitioner's truck was still parked at the house. When Mr. Bonner got to Ms. Myers's house, Petitioner's brother Gary was there but Petitioner was not. Mr. Bonner tried to go to the scene of the crime but was stopped by authorities. When he got back to his house, Gary Myers was gone and Petitioner was at his mother's house.

Mr. Bonner admitted on cross-examination that he had given two statements to authorities. Mr. Bonner did not mention seeing Petitioner's truck in either statement. Further, he admitted that he did not tell anyone that the truck had been there for several days without being moved. Mr. Bonner insisted that after he signed the statements he called a police officer and told him about the truck.

Charles Frost acted as the mitigation specialist on the defense team. When the case first started, Petitioner was potentially facing the death penalty. Mr. Frost has a degree in social welfare. Mr. Frost visited with Petitioner several times during his service on the case. He gathered information about Petitioner's social history and visited a number of Petitioner's family members in preparation for the case.

Mr. Frost spoke with trial counsel on a number of different occasions. Mr. Frost expressed concern over the fact that the evidence pointed to a fairly solid alibi defense by Petitioner. Mr. Frost did not think that trial counsel was able to put together a defense. Mr. Frost described trial counsel as confused, incoherent, and forgetful.

In examining the case, Mr. Frost felt that it was important to have a jury that was less emotional. Mr. Frost did not think that trial counsel appreciated the seriousness of jury selection. Mr. Frost testified that trial counsel sometimes lost track of himself, both prior to and during the trial. Mr. Frost did not think that trial counsel was mentally stable enough to effectively represent Petitioner at trial.

On cross-examination, Mr. Frost admitted that this was the only capital case he had ever worked on in his career. He acknowledged that trial counsel was able to put together a solid defense surrounding an alibi. Further, Mr. Frost admitted that he never expressed any concern about trial counsel's ability to the trial court.

Neca Shepard was next to testify at the post-conviction hearing. Ms. Shepard worked with Tom Isbell as a private investigator on Petitioner's case. Ms. Shepard had limited communication with trial counsel. She recalled two instances that she interacted with trial

counsel. On one occasion, trial counsel seemed forgetful and easily confused. Ms. Shepard described trial counsel's car as full of documents. Ms. Shepard felt that there was a lot of material that was uncovered during the investigation that should have been used at trial but was unable to articulate the substance of this material to the post-conviction court. On cross-examination, Ms. Shepard admitted that Petitioner's trial was the first capital case she had ever worked on during her career.

Thomas Borlund, Jr., an assistant to the one of the investigators in Petitioner's case, testified at the hearing. Mr. Borlund was responsible for compiling information on nearly 400 potential witnesses in Petitioner's case. Mr. Borlund was of the opinion that trial counsel should have called more witnesses at trial. He agreed that it was ultimately trial counsel's decision and admitted that he had never worked on a capital case before.

Thomas Isbell, a private investigator, worked closely with trial counsel on Petitioner's case. He was responsible for interviewing numerous witnesses. Mr. Isbell felt that trial counsel did not use the majority of the information that he secured prior to trial. Mr. Isbell recalled a meeting on the day prior to trial during which he gave trial counsel a list of forty witnesses that were essential to the trial. Trial counsel repeatedly informed Mr. Isbell that he was relying on an alibi defense. Mr. Isbell expressed concern that trial counsel was hanging his hat on one defense rather than a total defense.

Mr. Isbell was under the impression that trial counsel was ineffective due to his limited attention span, forgetfulness, and due to the fact that he was easily confused. Mr. Isbell informed trial counsel that Petitioner had a hernia surgery two weeks prior to the murders. Mr. Isbell interviewed Petitioner's doctor in preparation for trial and was disappointed that trial counsel did not use this information. Additionally, Mr. Isbell felt that trial counsel did a poor job of cross-examining the State's witnesses.

Mr. Isbell admitted that this was his first exposure to a capital case. He acknowledged that trial counsel's strategy from the beginning of the investigation was to focus on an alibi defense. Mr. Isbell admitted that he was not qualified to judge trial counsel's effectiveness because he is not an attorney. Further, Mr. Isbell did not express his concern about trial counsel's effectiveness to the trial court.

Petitioner took the stand at the hearing. According to Petitioner, trial counsel was not easy to communicate with about the trial. Petitioner stated that trial counsel would not listen to him, and Petitioner could not "connect" with trial counsel. Petitioner stated that trial counsel would not "listen" to what he had to say about the case. Petitioner stated that the defense was that of an alibi. Petitioner felt that trial counsel was often "confused." However, Petitioner stated that trial counsel "done [sic] pretty good starting off at the trial."

-6-

As the trial progressed, Petitioner stated that trial counsel "wasn't putting on the proof or doing nothing [sic]."

Trial counsel testified at the hearing that he had been licensed to practice law since March of 1962. Trial counsel had been involved in several capital cases prior to representing Petitioner. Trial counsel testified that he had experienced significant health problems since Petitioner's trial but did not "believe" that he had any health problems during the trial. Trial counsel described the trial as "complex" and that early on he decided to base his strategy on the fact that Petitioner had an alibi. Trial counsel felt that the State did not "have enough proof to convict" Petitioner at trial. Trial counsel recalled meeting with the other attorney on the case "numerous" times prior to trial. Trial counsel could not give a "specific number" of times that he met with Petitioner prior to trial.

Trial counsel testified that he did everything in his power to secure a not guilty verdict. Trial counsel was surprised by the guilty verdict because he did not think that there was sufficient evidence to convict Petitioner.

At the conclusion of the hearing, the post-conviction court determined that the investigation into Petitioner's case "was very thorough" and that the record indicated that "all that the petitioner asked for prior to trial was given to him." The post-conviction court commented specifically on the high volume of pro bono work that was done for Petitioner prior to trial.

The post-conviction court also determined that trial counsel was not ineffective for failing to call witnesses because the alibi defense was a "great defense" that "generally stands on its own." Further, the post-conviction court found that Petitioner was given a full defense in that trial counsel presented an alibi defense, argued that the evidence was not sufficient, and questioned the motive presented by the State for committing the murders. The post-conviction court did not hear any testimony at the hearing that would have changed the outcome of the case and did not hear of any additional defenses that could have been presented.

The post-conviction court determined that there was no testimony presented about any constitutional violations dealing with the jury. Further, the post-conviction court determined that trial counsel was not incompetent at Petitioner's trial. The post-conviction court commented that the circumstantial evidence was "very strong" and that "there is nothing . . . to show that [trial counsel] was anything other than an effective trial counsel at the time [of trial]."

The post-conviction court did not find any "competent" evidence of prosecutorial misconduct that occurred at trial. Further, the post-conviction court did not find that there were any "civil rights violations of witnesses."

The post-conviction court entered a separate, written order in which it denied the petition for post-conviction relief. Petitioner filed a timely notice of appeal.

*Analysis*

On appeal, Petitioner challenges the trial court's denial of post-conviction relief. Specifically, Petitioner complains that the post-conviction court improperly determined that he received effective assistance of counsel. Petitioner argues that trial counsel: (1) failed to adequately prepare and investigate the case; (2) failed to call witnesses that were beneficial to the case; and (3) was generally incompetent.

*Post-Conviction Standard of Review*

The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. *See State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). During our review of the issues raised, we will afford those findings of fact the weight of a jury verdict, and this Court is bound by the post-conviction court's findings unless the evidence in the record preponderates against those findings. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *Alley v. State*, 958 S.W.2d 138, 147 (Tenn. Crim. App. 1997). This Court may not reweigh or re-evaluate the evidence, nor substitute its inferences for those drawn by the post-conviction court. *See State v. Honeycutt*, 54 S.W.3d 762, 766 (Tenn. 2001). However, the post-conviction court's conclusions of law are reviewed under a purely de novo standard with no presumption of correctness. *See Shields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

*Ineffective Assistance of Counsel*[1]

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, the petitioner bears the burden of showing that (a) the services rendered by trial counsel were deficient and (b) that the deficient performance was prejudicial. *See Powers v. State*, 942 S.W.2d 551, 558 (Tenn. Crim. App. 1996). In order to demonstrate deficient performance, the petitioner must show that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*,

---

[1] Petitioner's argument on appeal seems to abandon the claims of prosecutorial misconduct and civil rights violations.

-8-

523 S.W.2d 930, 936 (Tenn. 1975). In order to demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997).

As noted above, this Court will afford the post-conviction court's factual findings a presumption of correctness, rendering them conclusive on appeal unless the record preponderates against the court's findings. *See id.* at 578. However, our supreme court has "determined that issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact . . . ; thus, [appellate] review of [these issues] is de novo" with no presumption of correctness. *Burns*, 6 S.W.3d at 461.

Furthermore, on claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight. *See Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. 1994). This Court may not second-guess a reasonably-based trial strategy, and we cannot grant relief based on a sound, but unsuccessful, tactical decision made during the course of the proceedings. *See id.* However, such deference to the tactical decisions of counsel applies only if counsel makes those decisions after adequate preparation for the case. *See Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Petitioner complains that trial counsel failed to adequately prepare and investigate Petitioner's case by failing to utilize "the information that his private investigator uncovered." The post-conviction court noted that this was a "complex" case but determined that the "investigation was thorough and complete at the time of trial." The testimony at the post-conviction hearing indicated that trial counsel had at least five bankers boxes full of documents related to the investigation of Petitioner's case and that the team of investigators had identified nearly 400 potential witnesses. Petitioner has failed to show that he was prejudiced by trial counsel's failure to prepare for the case. Petitioner is not entitled to relief on this issue.

Next, Petitioner complains that trial counsel failed to call witnesses to support his alibi defense. Dan McInnis, Terry Coppinger, and Jimmy Bonner were called to testify at the hearing in support of Petitioner's claim. Mr. McInnis testified that he saw Petitioner near a store on the morning of the crimes driving a little car. However, on cross-examination, Mr. McInnis was unsure of the date that he saw Petitioner and acknowledged that, at the time he saw Petitioner, there would have been ample time to commit the crimes. Mr. Coppinger testified that Petitioner's truck had been at his mother's house for several days around the

time of the murders. On further examination, however, Mr. Coppinger could not definitively say that Petitioner's truck was in the neighborhood on the morning of the crimes. Lastly, Jimmy Bonner testified that he saw Petitioner's truck at Petitioner's mother's house at the time of the murders. Mr. Bonner admitted that he did not include this information in his two statements to police but claimed that he had talked to investigators about this at a later time. The post-conviction court determined that the testimony of Mr. McInnis and Mr. Coppinger, "if presented at trial, would [not] have caused a different verdict." Further, the post-conviction court determined that Mr. Bonner was not credible. Petitioner has failed to show prejudice by trial counsel's failure to call these witnesses at trial.

Lastly, Petitioner insists that trial counsel was incompetent because he was "forgetful and confused." The post-conviction court found that trial counsel had no health problems at the time of Petitioner's trial. Specifically that "[t]here was no testimony from [Petitioner] or his witnesses of specific incidents to cause this Court to question [trial counsel's] competence in this case." We agree. The evidence does not preponderate against the findings of the post-conviction court. Petitioner is not entitled to relief on this issue.

*Conclusion*

For the foregoing reasons, the judgment of the post-conviction court is affirmed.

_____
JERRY L. SMITH, JUDGE